LARRY M. DREYFUS *et al.*, Indiv. and as Representatives of a Class of Similarly Situated Persons, Plaintiffs-Appellants, v. AMERITECH MOBILE COMMUNICATIONS, INC., Defendant-Appellee.

First District (1st Division)    No. 1—97—1496

Opinion filed August 24, 1998.

Lasky & Rifkind, Ltd., of Chicago (Norman Rifkind and Karen L. Prodromo, of counsel), for appellants.

Kirkland & Ellis, of Chicago (James P. Cusick and Steven C. Florsheim, of counsel), for appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Larry Dreyfus (plaintiff Dreyfus) and Rita Pun (plaintiff Pun) each contracted with defendant Ameritech Mobile Communications,

Inc., for two years of cellular telephone service. About one year into the contracts, defendant notified plaintiffs that it was passing along a $0.02-per-minute interconnect charge to its customers. On January 10, 1996, after the charge was imposed, plaintiff Dreyfus filed a putative class action complaint against defendant alleging that the imposition of the interconnect charge constituted a breach of contract, statutory consumer fraud and common law fraud. On June 4, 1996, plaintiff Dreyfus filed an amended complaint that named plaintiff Pun as an additional plaintiff.

In response to defendant's section 2—615 motion to dismiss (735 ILCS 5/2—615 (West 1994)), the trial court dismissed plaintiff Dreyfus' breach of contract claim, finding that his service contract did not contain a price guarantee. The trial court also dismissed the statutory and common law fraud claims, finding that the amended complaint failed to allege an actionable false statement or deceptive practice. However, the trial court denied defendant's motion to dismiss plaintiff Pun's breach of contract claim, finding that her contract did contain a price guarantee. Thereafter, defendant filed a section 2—619 motion to dismiss plaintiff Pun's claim based upon the voluntary payment doctrine (735 ILCS 5/2—619 (West 1994)). The trial court granted the motion. Plaintiffs filed a timely notice of appeal and raise the following issues: (1) whether the trial court properly dismissed plaintiff Pun's contract claim, finding it was barred by the voluntary payment doctrine; (2) whether the trial court properly dismissed plaintiffs' fraud claims; and (3) whether the trial court properly dismissed plaintiff Dreyfus' contract claim finding that his contract did not contain a price guarantee.

The relevant facts are as follows. On January 30, 1995, plaintiff Dreyfus entered into two agreements with defendant, a service agreement (Dreyfus Service Agreement) and a promotional service agreement (Dreyfus Promotional Agreement). The contracts provided that plaintiff Dreyfus would receive cellular telephone service from defendant under a special promotional program that was offered to employees of the Chicago Mercantile Exchange (CME Value Plan). Plaintiff Dreyfus chose the CME Value Plan, which was offered as part of the promotion, rather than one of the standard plans listed on the service agreement.

Under the CME Value Plan, plaintiff Dreyfus was to pay a $10 monthly fee and additional charges of $0.24 per minute for peak time calls and $0.11 per minute for off-peak calls. The Dreyfus Service Agreement provided the following regarding rate changes during the term of the contract:

"RATE CHANGES: If you select a Safe and Smart, Convenience,

Family Pack, Business Value Pack, Discount Weekender Value Pack, Extra Value Pack, Super Value Pack, or a Discount Time Pack Service Plan, the Service Rates and Charges in effect at the beginning of your initial Minimum Term will remain in effect until the end of that Minimum Term. You are hereby informed, and you acknowledge, that if you select any other Service Plan, Service rates may go up or down during the Minimum Term."

The Dreyfus Promotional Agreement contained a preprinted list of various standard service plans available and their respective price structures. Under this list was a box marked "Promotion" in which the following statement was preprinted:

"I choose to participate in the _____ Promotion. I understand that all of the conditions described in the Promotional Information apply to me, and I acknowledge that I received the Promotional Information before signing this Agreement."

The words "CME Value Plan" were hand-written in the blank space before the word "Promotion." At the bottom of the contract, above plaintiff Dreyfus' signature, the following provision was preprinted:

"EXTRA BONUS: If you purchase a Service Plan listed above, the Service Rates and Charges in effect at the beginning of your initial Minimum Term will remain in effect until the end of that Minimum Term."

On December 30, 1994, plaintiff Pun entered into a service agreement (Pun Service Agreement) and a promotional value agreement (Pun Promotional Agreement). Plaintiff Pun chose a standard service plan which guaranteed that service rates and charges would not change during the two-year contract term.

Defendant's promotional brochure provided the following:

"Ameritech cellular service **saves you up to 35%** over the competition...**and that's not all!**

With Ameritech pricing brochures, what you see is what you get.

—Did you know there are additional costs in the competitor's brochure? It states that you will be charged an additional $.02 per minute! Note that this cost is not included in their time package prices or their airtime list prices."

In December 1995, plaintiffs each received a letter from defendant in which defendant announced that "effective January 1, 1996, a two-cent [per minute] interconnect charge will appear on your bill as a line item called Interconnect Charge under the Other Charges and Credits section." Plaintiffs were first assessed interconnect charges in their monthly bills for January 1996. Thereafter, each monthly bill listed the $0.02-per-minute charge in the "Other Charges and Credits" section of the bill. Plaintiffs paid each bill in full.

On January 10, 1996, plaintiff Dreyfus filed a putative class action

complaint alleging that defendant's imposition of the $0.02-per-minute interconnect charge constituted breach of contract. Plaintiffs further alleged this charge violated the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 *et seq.* (West 1992)) and constituted common law fraud. Five months later, plaintiff Dreyfus filed an amended complaint adding plaintiff Pun as an additional plaintiff.

Defendant filed a motion to dismiss the amended complaint pursuant to section 2—615 of the Code of Civil Procedure. 735 ILCS 5/2—615 (West 1994). On September 10, 1996, the trial court granted defendant's motion to dismiss plaintiff Dreyfus' breach of contract claim. The trial court's decision was primarily based upon the fact that plaintiff Dreyfus chose a promotional CME Value Plan. The court reasoned: "Because the extra bonus provision and certain service plans were preprinted on the contract whereas Dreyfus' CME plan was handwritten [on the contract,] this is a strong indication that the extra bonus provision was meant to cover only the preprinted service plans." The trial court found that since plaintiff Dreyfus did not choose one of the listed plans, under the plain terms of the contract his rate was not guaranteed.

The court then addressed plaintiff Pun's breach of contract claim. Defendant did not argue that plaintiff Pun did not have a fixed-rate guarantee. Rather, defendant argued that the interconnect fee was not part of the fixed-rate guarantee but was a separate charge that could be increased by defendant during the life of the contract. The court found that this was a "fact question." The court stated that the increase "would appear to be a rate increase which violates that guarantee" and refused to "find as a matter of law that such an increase falls within an auxiliary charge which may not have been subject to the guarantee." Accordingly, the trial court found that plaintiff Pun did state a cause of action for breach of contract.

The court also found that plaintiffs failed to state a cause of action for either consumer fraud or common law fraud and dismissed those claims. The trial court stated that plaintiffs failed to allege that defendant lied in its advertising materials or that defendant had planned to pass on the fee all along.

Subsequently, defendant filed a motion to dismiss plaintiff Pun's breach of contract claim, pursuant to section 2—619 of the Code of Civil Procedure (735 ILCS 5/2—619 (West 1994)), arguing that plaintiff Pun's claim was barred by the voluntary payment doctrine. The court granted defendant's motion and found that plaintiff Pun's claims were barred under the doctrine since she had voluntarily paid each of her monthly bills without protest and with full knowledge of the facts.

The court further found that defendant had never threatened to terminate her service and, further, that defendant had a policy of discontinuing service only after sending written notice, which was never done here. Thus, the court found that plaintiff Pun's payments were not made under compulsion or duress. This appeal followed.

## A. STANDARD OF REVIEW

■ We briefly note that in reviewing the trial court's orders dismissing plaintiffs' claims, our standard of review is *de novo*. *Lockwood v. Standard & Poor's Corp.*, 289 Ill. App. 3d 194, 195 (1997); *American National Bank & Trust Co. v. Thomas*, 288 Ill. App. 3d 343, 346 (1997).

## B. VOLUNTARY PAYMENT DOCTRINE

Plaintiffs' first argument is that the voluntary payment doctrine does not preclude plaintiffs' class action complaint.

■ Under the voluntary payment doctrine, "money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered by the payor solely because the claim was illegal." *Smith v. Prime Cable*, 276 Ill. App. 3d 843, 847 (1995). A payment is involuntary if (1) the payor lacked knowledge of the facts upon which to protest the payment at the time of payment, or (2) the payor paid under duress. *Getto v. City of Chicago*, 86 Ill. 2d 39, 48-49 (1981). In other words, to negate the applicability of the doctrine, plaintiff must "not only show that the claim asserted was unlawful but also that payment was not voluntary, that there was some necessity which amounted to compulsion. [Citations.]" *Smith*, 276 Ill. App. 3d at 848.

■ This court has recognized that today, the nature of the duress sufficient to establish compulsion has broadened and that recovery of a voluntary payment made under a claim of right can occur " '[w]here a person, to prevent injury to himself, his business or property, is compelled to make payment of money which the party demanding has no right to receive and no adequate opportunity is afforded the payor to effectively resist such demand.' " *Smith*, 276 Ill. App. 3d at 849, quoting *Schlossberg v. E.L. Trendel & Associates, Inc.*, 63 Ill. App. 3d 939, 942 (1978). Protest may also serve as evidence of compulsion and an unwillingness to pay; however, it does not conclusively establish compulsion where compulsion is disproved by other circumstances. *Smith*, 276 Ill. App. 3d at 849. In determining whether plaintiff Pun's payment was made under compulsion, this court must consider all the facts and circumstances surrounding the transaction. *Smith*, 276 Ill. App. 3d at 850.

Plaintiffs first argue that plaintiff Pun's use of her cellular telephone is an economic necessity and, therefore, plaintiff Pun's fear of losing her cellular phone service constitutes sufficient compulsion to render the voluntary payment doctrine inapplicable. In response, defendant argues that, to establish duress, plaintiff Pun must show that there was an actual threat to deprive her of some product or service that was a necessity for her business or personal life and relies primarily on *Smith v. Prime Cable*, 276 Ill. App. 3d 843 (1995). Defendant asserts that plaintiff Pun cannot allege either that defendant actually threatened to cut off her cellular service or that cellular phone service is a necessity.

Plaintiffs rely primarily on the following three cases in support of their argument on this issue: *Getto v. City of Chicago*, 86 Ill. 2d 39 (1981); *Ross v. City of Geneva*, 71 Ill. 2d 27 (1978); and *Geary v. Dominick's Finer Foods, Inc.*, 129 Ill. 2d 389 (1989). We will briefly review each in turn.

In *Getto*, plaintiff filed a class action complaint against Illinois Bell, four other telephone companies and several municipalities challenging defendants' method in calculating the municipal message tax. *Getto*, 86 Ill. 2d at 42-44. Defendants argued that since plaintiff had paid his utility bill without protest until suit was filed he was barred by the voluntary payment doctrine. *Getto*, 86 Ill. 2d at 49. The Illinois Supreme Court held that the voluntary payment doctrine was inapplicable because plaintiff did not have full knowledge of the facts. *Getto*, 86 Ill. 2d at 51. However, the supreme court went on to state:

> "Even were it to be held that the plaintiff had sufficient knowledge of the facts to permit a conclusion that all payments prior to 1977 were voluntary, we judge that the implicit and real threat that phone service would be shut off for nonpayment of charges amounted to compulsion that would forbid application of the voluntary-payment doctrine." *Getto*, 86 Ill. 2d at 51.

In *Ross*, plaintiff filed suit against the City of Geneva challenging the imposition of a 10% surcharge on his electric bill. *Ross*, 71 Ill. 2d at 30. Plaintiff paid the surcharge separately and marked "protest" on his bill. *Ross*, 71 Ill. 2d at 30-31. The court found plaintiff was not precluded by the voluntary payment doctrine from asserting the claim. *Ross*, 71 Ill. 2d at 33. In so holding, the supreme court noted:

> "The record shows that it was defendant's policy to terminate service to users in the event of nonpayment of imposed charges and that in many instances such service had in fact been terminated. *** Confronted with the choice of payment of the surcharge or termination of service, plaintiff, in making the payment, acted with prudence and is not barred from recovery of the sums paid." *Ross*, 71 Ill. 2d at 33-34.

In *Geary*, the plaintiffs challenged a sales tax imposed on tampons and sanitary napkins. *Geary*, 129 Ill. 2d at 392. The supreme court, relying on *Getto* and *Ross*, found that since tampons and sanitary napkins were necessities that could not be purchased without paying the tax imposed, plaintiffs sufficiently pled duress. *Geary*, 129 Ill. 2d at 402. The supreme court rejected defendant's argument that plaintiffs should be required to plead and prove that defendants actually threatened or coerced them to pay the extra tax. *Geary*, 129 Ill. 2d at 399-401.

We find that these cases do not aid plaintiffs' argument as they are distinguishable in one very important respect, they all involved necessities. Plaintiffs attempt to convince this court that cellular telephone service is an economic necessity. They argue that "the use of cellular telephones has become common and has become a seamless part of our modern telephone system." Plaintiff Pun sells new and used cars at a dealership and asserts that "the loss, or even threat of loss, of her cellular telephone service would do significant harm to her business." Plaintiffs also assert that the fact that defendant has the ability to temporarily or permanently interrupt service for failure to pay also precludes application of the voluntary payment doctrine.

We cannot accept plaintiffs' arguments. The *Geary* court, in analogizing the purchase of tampons and sanitary napkins to the use of telephone and electric service, stated:

> "The plaintiffs in *Getto* and *Ross* had no other reasonable source from which to obtain telephone and electric service ***. Similarly, plaintiffs in the case at bar had no other reasonable source from which to obtain tampons and sanitary napkins without paying the taxes because all retail stores had to comply with the various sales tax laws." *Geary*, 129 Ill. 2d at 400.

Based on the court's reason in *Geary*, the existence of a reasonable alternative source precludes any arguments about whether a particular product or service constitutes a necessity.

■ In the instant case, plaintiff Pun has not alleged a lack of access to land-line phones at her work or anywhere else. Indeed, that would be a difficult argument to formulate as reasonable alternatives to cellular phone service unquestionably exist, whether at plaintiff Pun's place of business, her home, or a payphone. Thus, we find that cellular phone service is not a necessity and, therefore, plaintiff Pun cannot establish that payments were made under compulsion or duress. See *Geary*, 129 Ill. 2d at 398 (recognizing that if the service is not a necessity there can be no duress).

Accordingly, we find that the trial court properly concluded that plaintiff Pun's cause of action was precluded by the voluntary payment doctrine.

## C. DREYFUS' BREACH OF CONTRACT CLAIM

■ Plaintiffs next argue that there is an issue of fact as to whether the CME Value Plan chosen by plaintiff Dreyfus is subject to the rate guarantee. We find that the record does not support such a position.

Plaintiff Dreyfus' contract explicitly lists the service plans that include a "service rates and charges" guarantee; the CME Value Plan selected by plaintiff Dreyfus is not on the list. The contract further states that, if a customer selects a plan other than a "Safe and Smart," "Convenience," "Family Pack," "Business Value Pack," "Discount Weekender," "Value Pack," "Extra Value Pack," "Super Value Pack," or "Discount Time Pack Service Plan," "service rates may go up or down during the minimum term."

It is clear that the CME Value Plan is not a time-pack. As defendant notes, the nature of a time-pack is such that it provides a customer with a set amount of monthly air time at a specified price. The CME Value Plan does not; it provides only for a monthly charge of $10 plus additional per-minute rates. There are five time-pack service plans listed on the attachment to the Dreyfus Promotional Agreement with each explicitly labeled a time-pack. The CME Value Plan is not referred to as a time-pack. The plain language of the contract refutes plaintiffs' assertion that the CME Value Plan falls within the definition of "Discount Time Pack Service Plan" and, therefore, plaintiff Dreyfus' rates were not guaranteed.

Accordingly, we find that the trial court properly dismissed plaintiff Dreyfus' breach of contract claim.

## D. STATUTORY FRAUD CLAIMS

Plaintiffs' final argument is that the amended complaint sufficiently alleged a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/2 *et seq.* (West 1992)).

■ The Consumer Fraud Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices." 815 ILCS 505/2 (West 1992). To state a claim under the Consumer Fraud Act, a complaint must set forth specific facts that show: (1) a deceptive act or practice; (2) an intent by the defendant that plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving a trade or commerce. *People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill. 2d 473, 492 (1992).

Plaintiffs' amended complaint alleges that defendant "made false statements or omissions that it would not charge for the interconnect cost and not raise subscriber rates during the contract period *** with the intent that consumers would rely on then [*sic*], and induce consum-

ers to become subscribers of [defendant]." The amended complaint further alleges that defendant "made false statements or omissions to plaintiffs by advising that [defendant] would not separately charge its subscribers for the interconnect cost, and not raise subscriber rates during the initial Minimum Term of the contract."

■ We find that plaintiffs have failed to allege the necessary false statement of material fact. As the circuit court noted:

> "[P]laintiffs have not alleged nor have they argued that [defendant] lied in its advertising materials in 1993 or 1994 by stating that it did not pass the 2 cent per minute fee on to its customers. In fact plaintiffs readily admit that [defendant] did not pass this fee on to its customers at the time it so advertised, and continued this practice for a year after circulating the promotional materials.
>
> Further plaintiffs have not alleged that when [defendant] advertised that it did not pass this fee on to its customers it had already planned on doing so in the near future. *** Instead plaintiff has alleged in effect that [defendant] did not charge the fee in order to induce people to become customers then later made a decision that it would start charging the fee.
>
> Such an allegation and the letter from [defendant] *** indicate that [defendant] made a business decision that it could no longer absorb the interconnect charge itself."

Accordingly, as plaintiffs have failed to allege a deceptive practice, we conclude that the trial court properly dismissed plaintiffs' claim of statutory fraud.

For the aforementioned reasons, the judgment of the circuit court of Cook County is hereby affirmed.

Affirmed.

O'BRIEN and GALLAGHER, JJ., concur.